# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-05-1125 TUC RCC (JM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Tajma Demarcus Murphy; and Derek Jason-Lyn Collins, | |
| Defendants. | |

This matter was referred to Magistrate Judge Marshall for all pretrial matters. Defendant Derek J. Collins filed a Motion to Suppress Physical Evidence and Statements [Docket No. 23] and Defendant Tajma Demarcus Murphy joined [Docket No. 44]. The Motion was heard by Magistrate Judge Marshall on April 11 and 12, 2006.

Defendant Collins was present for both days of the hearing and was represented by counsel. Defendant Murphy was present on April 11, 2006, and his presence was waived prior to the continued hearing on April 12, 2006. Murphy's counsel was present for both days of the hearing.

Three witnesses were presented by the Government: Jason Steven, a special agent with United States Immigration and Customs Enforcement ("ICE"); Jesus Lozania, a special agent with ICE; and Bryna Warnock, a special agent with ICE. The witnesses were examined, cross-examined, and questioned by the Court.

Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Collins' Motion to Suppress Physical Evidence and Statements be denied.

## I. **FINDINGS OF FACT**

On April 29, 2005, Agent Stevens met Defendant Murphy and Murphy expressed an interest in providing information to law enforcement agents. (TR1:19-20).[1] At that time, Agent Stevens explained to Murphy the obligations associated with such an arrangement. (TR1:20).

Subsequently, on May 11, 2005, Agent Stevens received a call from sector communications advising him that Murphy had crossed the port of entry in Nogales, Arizona. (TR1:20). Shortly thereafter, Agent Stevens received a phone call from Murphy, who stated that he was going to an address of 5838 East Second Street in Tucson and that he thought the vehicle in which he was traveling was loaded with illegal drugs. (TR1:20-21 & 24). Murphy also provided a description of the house, indicating that there was a large tree in the yard and a white Chevrolet Caprice in the carport. He also described the color of the house (white with blue trim) and the fence (blue and white). (TR1:21 & 24).

When they received this information, Agent Stevens, and his partner, Agent Metzler, were in Tubac, Arizona, south of Tucson, and proceeded to the address provided by Murphy. (TR 1:24-25). After concluding that the residence located at 5838 East Second Street did not match the description Murphy provided, the agents continued down the street and found a residence nearby that perfectly matched Murphy's description. (TR 1:25). The matching residence had an address of 57 38 East Second Street. (*Id.*)

The agents set-up surveillance of the matching residence and, at about 7:15 p.m., conducted a "knock and talk." (TR 1:25, 57, 58). Agent Metzler, along with another agent, Agent Bland, knocked on the door of the residence and it was answered by a woman who stated she had been living there for "a couple of months." (TR 1:26). The woman gave the

---

[1] "TR1" refers to the Transcript of Motion Hearing dated April 11, 2006, and filed with the Clerk on April 19, 2006. "TR2" refers to the Transcript of Motion Hearing dated April 12, 2006, and filed with the Clerk on April 19, 2006.

agents consent to search the residence. (TR 1:26-27). In conducting the search, Agent Metzler located a package containing what he believed to be kilos of cocaine. (TR 1:27). At that point, Agent Stevens ordered everyone from inside to home to relocate to the carport outside while he contacted the United States Attorney's Office. (TR 1:28). A decision was made to obtain a search warrant. (*Id.*).

At approximately 8:30 p.m., Agent Stevens, while waiting for the search warrant, was parked in an unmarked pickup truck down the street to the west of the residence. (TR 1:28, 49, 58). There were also two unmarked ICE vehicles parked in front of the house and the occupants of the house, along with two or three ICE agents, were under the carport. (TR 1:28, 33). Because he had received information from the home's occupant that the homeowner was expected to return and that he drove a white SUV, Agent Stevens also positioned additional agents "on the outsides of the streets". (TR 1:28-29).

Agent Stevens was also monitoring traffic from his vehicle while awaiting the search warrant. (TR 1:31-32). During this time, upon seeing a couple of white vehicles, he "called out" for agents to make investigative stops. He then observed a white passenger car and, as it approached the subject residence, it drove very slowly and stopped momentarily in front of the residence. (TR 1:32). The vehicle then proceeded down the street and stopped. (*Id.*) The vehicle's brake lights remained on for "a couple of minutes maybe," as Agent Stevens continued to watch the vehicle in his rear-view mirror. (*Id.*) The vehicle subsequently turned around and again drove by the house taking the same action it had on the first pass. (*Id.*). At that point, Agent Stevens directed Agents Warnock and Newcomer to institute an investigative stop of the vehicle and identify the driver. (TR 1:32; 2:49).

When Agent Warnock first saw the vehicle, it was moving slowly past the residence. (TR 2:48). As it passed, Agent Warnock pulled out behind the vehicle and attempted to get the license plate number. (TR 2:49). As she got closer to the vehicle, it started to drive "a little bit faster." (*Id.*). At that point, Agent Warnock and her partner, who was in another car, activated their emergency lights and sirens and the vehicle began to take evasive action. (TR

3

1  2:49, 64). At that point, the vehicle (a white Buick) began traveling at a high rate of speed.
2  The agents attempted to corner the vehicle at an intersection, but the car jumped the curb and
3  proceeded to move at high speeds. (TR 2:50). As the Buick approached a Wal-Mart on Kolb
4  and Speedway, Agent Warnock noticed additional emergency lights and discovered that the
5  Tucson Police Department had joined the chase. (TR 2:50-51). Later, she learned that the
6  Buick had nearly crashed into a TPD motorcycle officer in an intersection. (TR 2:51). After
7  the chase came to an end in the Wal-Mart parking lot, the driver was taken into custody by
8  TPD and placed in the back seat of a police cruiser. (TR 2:66). Agent Warnock talked to
9  the driver, who was identified as Defendant Collins, and sought permission to "peruse
10 through his cell phone," which she had obtained from a TPD officer. (TR 2:51-52, 67).

11 Agent Stevens arrived on the scene and determined that Collins had been taken into
12 custody by the Tucson Police Department based on an outstanding DUI warrant. (TR 1:37).
13 Agent Stevens told Collins that he was an agent with United States Customs and told Collins
14 that he had driven by a location where a narcotics investigation was underway. (TR 1:37).
15 He explained that Collins' slow speed while going by the house had concerned him and asked
16 Collins where he had been going. (TR. 1:37). Collins stated that he was going to a house
17 located at Second and Van Buren, which is near Speedway and Craycroft, (TR 1:38).
18 Collins also said the car was not his and that he was just going to take it to a house after
19 getting the address from a cell phone call. (*Id.*). After this discussion, Agent Stevens left the
20 location. (*Id.*).

21 The vehicle Collins was driving was impounded to the DEA lot in Tucson. (TR 1:39).
22 The following morning, on May 12, 2005, the vehicle was taken to Nogales, Arizona. (TR
23 1:39, 44). A search warrant was obtained and Agent Jesus Lozania searched and x-rayed the
24 vehicle. (TR 1:39, 43; Exhibit 6 (Search Warrant)). Agents discovered 7.02 kilograms of
25 cocaine in a non-factory compartment under the vehicle's front seats. (TR 1:40, 43, 80; TR
26 2:8-13). Agent Lozania then contacted the Pima County Detention Center, where Collins
27
28

was being held on state charges, and asked the facility to hold him until ICE agents could pick him up. (TR 2:14).

Agent Robert Whitchurch transported Collins from Tucson to the ICE office in Nogales. (TR 2:14-15). At approximately 3:30 p.m., Collins was taken to an interview room by Agent Lozania, who introduced himself and advised him that he was going to conduct an interview. (TR 2:16). Also in the room was Agent Mario Mendez. (TR 2:38). Agent Lozania advised Collins of his Miranda rights, both orally and in writing. (TR 2:16-17; Exhibit 4). Both Agent Lozania and Collins signed the form. (TR 2:17; Exhibit 4). Collins indicated he understood his rights and indicated that he was willing to talk. (TR 2:18). Collins then provided a statement. (TR 2:18). Collins also consented once again to the search of his cell phone. (TR 2:25-27; Exhibit 5).

## II. CONCLUSIONS OF LAW

### A. Legality of the Stop

Collins moves to suppress the evidence seized following the unlawful stop of the vehicle he was driving, alleging that reasonable suspicion that would support the stop did not exist. The Fourth Amendment protects the right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures. *U.S. v. Hensley*, 469 U.S. 221, 226 (1985). In *Terry v. Ohio*, 392 U.S. 1, 88 (1968), the Supreme Court held that, consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances. The Court has held that law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *Hensley*, 469 U.S. at 226.

Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981). When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer

5

at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The articulable facts forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1445 (9th Cir.1994).

Here, the stop of Collins was supported by reasonable suspicion. By the time Collins drove by the residence, the agents had found cocaine in the house and believed it was a stash house. There were no marked law enforcement vehicles on the scene and it was dark in the area around the house. Agent Stevens, while awaiting the search warrant, had been observing traffic and no other cars had slowed and stopped as Collins' did. When Collins drove by, he stopped in front of the residence, proceeded down the street, and then stopped again at the end of the street for two minutes. At that point, Collins' actions might be interpreted as "rubbernecking." However, as Agent Stevens continued to watch the vehicle in his rear-view mirror, Collins turned around and *again* drove by the house taking the same action he had on the first pass. Based on these events, it was reasonable for Agent Stevens to conclude that Collins was not a mere passerby, but was engaged in criminal activity involving the house. Collins' prolonged stop at the end of the street, coupled with his return and repeated slowing in front of the house, supported a reasonable suspicion that Collins' interest in the residence was based on more than simple curiosity. Added to Agent Stevens' observations were his concerns about officer safety. These considerations gave Agent Stevens reasonable suspicion to make the stop.

The Government also contends that Collins' failure to immediately yield after the agents activated their lights and sirens can also be considered in evaluating reasonable suspicion. In *United States v. Santamaria-Hernandez*, 968 F.2d 980 (9th Cir. 1992), the Ninth Circuit, relying on *California v. Hodari D.,* 499 U.S. 621 (1991), concluded that a fleeing suspect is not "seized" for Fourth Amendment purposes until apprehended at the end of the chase. 968 F.2d at 984. Thus, when evaluating the "totality of the circumstances" giving rise to reasonable suspicion, the court authorized the consideration of the refusal to

stop in response to emergency lights. *Id.* When Collins' flight is considered, the finding of reasonable suspicion, as was the case in *Santamaria,* becomes indisputable.

### B.     Voluntariness of the Statements

Collins further contends that his statements are subject to suppression because he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. "A valid waiver of *Miranda* rights depends upon the 'totality of the circumstances including the background, experience, and conduct of defendant.'" *United States v. Garibay*, 142 F.3d 534, 536 (9th Cir. 1998). The burden is on the Government to show that *Miranda* rights were administered and that the Defendant agreed to waive them. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).

Here, evidence was introduced establishing that *Miranda* rights were administered to Collins and that he expressly waived his rights. In Nogales, Collins was taken to an interview room by Agent Lozania, who introduced himself and advised him that he was going to conduct an interview. Agent Lozania advised Collins of his Miranda rights, both orally and in writing. Both Agent Lozania and Collins signed the waiver form. Collins indicated he understood his rights and indicated that he was willing to talk. Collins then provided a statement. The written waiver constitutes strong evidence of a valid waiver. *Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir. 1990). Moreover, the Court finds Agent Lozania's testimony specific and credible on this point. Considering this evidence, the Court finds that the Government has satisfied its burden and shown that the rights were read and waived.

### C.     Sixth Amendment Right to Counsel

Relying on *United States v. Covarrubias*, 179 F.3d 1219 (9th Cir. 1999), Collins next asserts that his Sixth Amendment right to counsel was violated when federal agents interviewed him without his attorney after he had appeared on the State Court charges for which he was initially arrested. In *Covarrubias*, the Ninth Circuit held that the right to counsel attached to uncharged crimes that were "factually related" to a specifically charged offense. *Id.* at 1223-24. This holding would obviously be of no help to Collins because the

charge for which TPD arrested him, the DUI, was not factually related to the drug charges he faces in the instant case.  More important, however, is that *Covarrubias* is no longer valid on this point.  In *Texas v. Cobb*, 532 U.S. 162 (2001), the Supreme Court held that the Sixth Amendment right to counsel does not extend to uncharged crimes unless they are the "same offense" as the charged crime.  *Id.* at 173.  Here, Collins makes no argument, and the Court cannot independently devise one, that the State DUI charge is the same as the Federal drug charges alleged here.  Thus, Collins' Sixth Amendment right to counsel was not violated when Agent Lozania interviewed him in Nogales.

## III. RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an Order **denying** the Motion to Suppress Physical Evidence and Statements [Docket No. 23] filed by Defendant Derek J. Collins, in which Defendant Tajma Demarcus Murphy joined [Docket No. 44].

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.  Thereafter, the parties have ten (10) days within which to file a response to the objections.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues.  *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).  If objections are filed, they should bear the following case designation: **CR 05-1125-TUC-RCC**.

DATED this 5th day of May, 2006.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge

9